IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

QWENTON NARVELL BADGER,          §
                                §
     Petitioner,                §
                                §
v.                              §          Civil No. 4:22-CV-947-Y
                                §
BOBBY LUMPKIN, Director,        §
TDCJ-CID,                       §
                                §
      Respondent.               §

**OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is a petition and supporting brief seeking a writ of habeas corpus under 28 U.S.C. § 2254 filed by Petitioner, Qwenton Narvell Badger, a state prisoner, against Bobbie Lumpkin, director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent. After having considered the pleadings and relief sought by Petitioner, the Court concludes that the petition must be denied.


**I. FACTUAL AND PROCEDURAL HISTORY**

**A.   Procedural history**

Badger is in custody as a result of a judgment and sentence of the 371st Judicial District Court, Tarrant County, Texas, in case number 1496031D, styled *The State of Texas v. Qwenton Narvell Badger*. (SHCR at 6-8(judgment and sentence for murder as a repeat

offender), doc. 13-24.)[1] In that case, Badger pleaded not guilty, but the jury found him guilty and the court sentenced him to thirty-five years of confinement on October 26, 2018. (*Id.* at 6-7. doc. 13-24.)

Badger appealed, but the appellate court affirmed his convictions in October 2019. *See Badger v. State*, No. 02-18-00475-CR, 2019 WL 5089761 (Tex. App.—Fort Worth 2019, pet. ref'd). He filed a petition for discretionary review, but the Texas Court of Criminal Appeals (TCCA) refused it. *Badger v. State*, No. PD-1170-19 (Tex. Crim. App. 2019).

Badger filed a state application for writ of habeas corpus in March of 2021.(SHCR at 15, doc. 13-24.) The TCCA denied his application "without written order on findings of trial court without [a] hearing and on the Court's independent review of the record" in October of 2021. (SHCR at "Action Taken" cover sheet, doc. 13-20.)

With the assistance of counsel, Badger filed the instant petition and brief[2] seeking relief under 28 U.S.C. § 2254 on October 20, 2022.(Pet. 1-17, doc. 1; Brief 1-20 (plus exhibits),

---

1. "SHCR" refers to the Clerk's Record of pleadings and documents filed with the court during Petitioner's state habeas-corpus proceedings. *See generally, Ex parte Badger*, Application No. 92,896-01. These records are on the Court's docket at docs. 13-20 through 13-24. "CR" refers to the Clerks's Record, on the docket at doc. 13-1. The Reporter's Record ("RR") is on the docket at docs. 13-2 through 13-11.

2. Counsel completed and filed a form petition for relief under § 2254 (doc. 1), and a separate document entitled "Petition for Writ of Habeas Corpus," (doc. 2) which the Court has construed and cited as a brief.

doc. 13-2.)

**B.   Factual Background**

The intermediate appellate court summarized the factual background in this case as follows:

**Hicks's Problems with a Coworker**

Vanessa Valle, who was Hicks's girlfriend for over fifteen years, testified that in April 2017, a temporary job service had placed Hicks with [Ben E. Keith,] a beverage distribution company located in southwest Fort Worth. Hicks worked from 4 p.m. until whenever the job was finished—sometimes around 3:00 a.m.—and usually came home around 10:15 p.m. to eat his "lunch."

When Hicks came home for his lunch on April 18, 2017, he told Valle that he was upset with a guy from work. Valle was fearful for Hicks and told him not to go back to work. Hicks said that he had to take care of his family, kissed Valle on the forehead, and returned to work.

**Badger and Hicks Exited the Parking Lot at the Same Time**

The daily log of vehicles from the guard shack at the Ben E. Keith beverage distribution center reflected that Badger, with license plate HRZ ####, entered at 10:07 p.m. on April 18 and left at 1:10 a.m. on April 19. Hicks also left at 1:10 a.m. on April 19.

**The Shooting**

Eric Wisdom, who worked on Will Rogers Boulevard near the Ben E. Keith beverage distribution center, testified that he was sitting in his vehicle during a work break on the night in question and noticed a dark-colored vehicle sitting on Will Rogers Boulevard with its headlights on. Wisdom then heard a gunshot followed approximately ten seconds later by a second gunshot. After the second gunshot, Wisdom saw another set of headlights on a light-colored vehicle, which came from behind the stationary vehicle and sped past him, and he called 911.

On cross-examination, Wisdom testified that he was absolutely certain that the vehicle that sped away was not black or red. Wisdom believed that the person in the light-colored car had fired the shots. Wisdom wrote out a statement at the scene and gave it to the police. He was not contacted by the police after that date.

Ida Barnes testified that her nephew Deaundre Mitchell worked at the Ben E. Keith distribution center and that she drove him to and from work. She recalled that after she had picked up Mitchell on the night in question, she saw what she initially thought was a wreck. As Barnes slowed to fifteen or twenty miles per hour, she saw that there had not been a wreck because there was no damage to either car; instead, two men were standing outside their vehicles and appeared to be arguing. Barnes said that a short black man [FN 1-The record reflected that Badger was five feet, four inches tall] was near a maroon car, which was shaped like a Mercury or a Taurus and which was parked behind a black car that had a tall black man [FN 2-The record reflected that Hicks was six feet, two or six feet, three inches tall] near it.

"[N]ot even two minutes" after Barnes had driven less than two blocks past the two cars, she heard a single gunshot and slowed down. In her rearview mirror, she saw the maroon car speed around the black car and watched as the maroon car sped up to her. Barnes accelerated and called 911.

When the maroon car passed Barnes's vehicle, Barnes caught part of the license plate—an H and a Z. Barnes testified that Will Rogers Boulevard did not have much traffic on it at that time, which was after midnight.

**Hicks's Death**

Officer Collin Sweeney with the Fort Worth Police Department (FWPD) testified that he was dispatched to a shooting in the 6900 block of Will Rogers Boulevard at 1:15 a.m. on April 19, 2017. When Officer Sweeney arrived on the scene two minutes later, he saw a black sedan that had crashed into a light pole. Officer Sweeney saw blood all over the windshield and dashboard and a black male slumped over the gear shift. Officer Sweeney felt what he

thought was a hole or slivered skin on the driver's neck. Hicks was pronounced dead in the emergency room at John Peter Smith Hospital at 1:42 a.m.

Dr. Mark Krouse, the chief deputy medical examiner who performed the autopsy, testified that Hicks was a healthy thirty-two-year-old man. The cause of his death was blood loss from the carotid artery injury due to a gunshot wound to the neck. Dr. Krouse ruled Hicks's death a homicide.

**The Investigation**

Officer Cassidy Tischler with the FWPD testified that when she arrived on the scene at 1:29 a.m., she obtained a description of the suspect's vehicle—a maroon four-door Mercury. Officer Tischler provided information about the vehicle to the FWPD's Real-Time Crime Center, which identified two vehicles in the southside area matching the vehicle's description. After running the partial license plate information, only one of the two vehicles matched both the vehicle description and the partial license plate. Officer Tischler arrived at 2:00 a.m. at the address connected to that vehicle and saw a maroon vehicle parked in front of the home.

Detective Bruce Anderson with FWPD's Special Response Team was called around 2:00 or 3:00 a.m. to guard a car that had been involved in a homicide. He went to a cul-de-sac and surveilled the vehicle. While he and his team were watching the vehicle in the cul-de-sac, the patrol unit informed Detective Anderson that in the next cul-de-sac over, there was a black male who was wearing a white shirt and red shorts. Detective Anderson walked around the corner and saw that the male was standing in front of the house that was directly behind the house that was being surveilled. Detective Anderson described the individual as a medium-skinned black male who was five foot ten to six feet tall and who was around thirty to thirty-five years old. Detective Anderson instructed two members of his team to go talk to the male. As the two team members turned the corner, the man took off running and jumped a fence. The person was not caught. Detective Anderson testified that the man looked vaguely like a man in a family portrait that was in the entryway of the home where the vehicle was being surveilled.

Officer Christopher Bain with FWPD's crime scene search unit testified that he had arrived at 2:02 a.m. and had photographed the crash site (outside the Ball Corporation parking lot). Officer Bain also collected two shell casings and a live .9 millimeter bullet from the shooting scene (the corner of Joel East and Will Rogers).

He then went to Badger's home. Officer Bain testified that a red vehicle with license plate HRZ #### was parked at the home. Officer Bain took pictures of the vehicle showing red stains in the tire tread and "spatter" along the underside of the vehicle. Inside the home, Officer Bain collected three guns and almost 400 rounds of ammunition. [FN 3-The guns collected from the home did not match the ballistics from the two casings and the live cartridge that were found at the shooting scene].

Detective Ernest Pate with FWPD testified that he had arrived at the scene on Will Rogers Boulevard at 3:00 a.m. and had noted a black Ford vehicle that was resting against a lamp post. The driver of the vehicle had already been transferred from the scene via ambulance.

Around 4 a.m., Detective Pate went to the address associated with Badger's license plate and saw a red four-door Mercury with an H and a Z in the license plate. He noted that the vehicle appeared to have blood in the wheel well and requested that the vehicle be taken to the auto pound. [FN 4-Officer Timothy Lee with FWPD's Crime Scene Search Unit testified that he went to the crime scene bay at the auto pound two days after the incident. Officer Lee noted that the red Mercury's right front wheel and back wheel on the passenger side contained red stains. He took sample swabs of several places that contained red stains, and using black fingerprint powder, he created a tread pattern of the right side wheels]. Detective Pate knocked on the door and received Badger's wife's consent to search the home. Badger was not in the home.

Detective Pate obtained surveillance video from the guard shack at the Ben E. Keith distribution center, but it was not of good quality, did not show the date and time, and did not show the two vehicles involved. Detective Pate was told that there was video available showing the date and time, but he was unable to obtain that video after following up with the contact person several times. Detective Pate testified on cross-examination that he did not check with any of the owners of the surrounding buildings to see if they had surveillance cameras.

6

Detective Pate spoke with several managers and with twenty to thirty employees at the distribution center and received no information that Hicks and Badger had any prior incidents, arguments, or fights.

On cross-examination, the defense asked if Detective Pate had made any mistakes in this investigation, and he replied, "Sure." Detective Pate explained that there were three witnesses—Wisdom, Barnes, and Mitchell—and that his understanding was that all three witnesses had been interviewed when, in fact, only two were interviewed. Detective Pate did not discover until he was preparing for trial that Wisdom had not been interviewed. Detective Pate said that if he had the chance to redo this investigation, he would interview Wisdom. But Detective Pate stated that he "100 percent" stood behind the investigation that he had done in this case and that interviewing Wisdom would not have changed the outcome of the case. Detective Pate said that he would "take the forensic evidence over what anyone says any day because ... people make mistakes."

Detective Pate testified that the steering wheel of the red Mercury was swabbed and that the swab was sent for DNA testing but was not tested for gunshot residue (GSR). Detective Pate explained that DNA evidence is stronger than GSR because GSR can be picked up from an item other than a gun and because GSR is questioned by the Texas Forensic Commission whereas DNA is not.

Detective Pate acknowledged that his supervisor did not sign off on Badger's arrest warrant. On redirect, Detective Pate testified that the arrest warrant was signed by a judge.

**Badger's Arrest**

After the arrest warrant was issued, FWPD Officer Michael Ruelas surveilled Badger's wife but rarely saw her at home in the evenings. Officer Ruelas believed that Badger's wife was meeting Badger somewhere. Officer Ruelas ultimately arrested Badger at a Motel 6 on South Freeway on April 25, 2017.

**Forensic Evidence**

7

John Witkowski, a forensic scientist with the Texas Department of Public Safety's regional crime lab, testified that he had compared rolled tire impressions from the red Mercury to photographs of tire impressions that were left in blood stains on the roadway at the scene. After his analysis, Witkowski concluded that

> [t]he two partial overlapping tire impressions are similar in size and general tread design to the test impressions from the right rear tire of the suspect vehicle, and the second partial tire impression is similar to the right front tire of the suspect vehicle.
>
> It is my opinion that these partial tire impressions could have been made by these tires from the suspect vehicle or any other tire with a similar tread design.

Trisa Crutcher, a senior forensic scientist with the FWPD crime lab in the biology unit, testified that the partial DNA profile obtained from the swab of the red Mercury's steering wheel was consistent with originating from Badger and that the DNA profile obtained from the swab of the red Mercury's interior front right wheel well was identified as originating from Hicks.

*Badger*, 2019 WL 5089761 at *1–4 (footnotes from original state appellate court opinion incorporated into text).


## II. ISSUES

Badger asserts that he received ineffective assistance of counsel because his trial counsel failed to (A) sufficiently question the venire panel, thereby allowing a possibly biased juror on the jury panel, (B) present evidence that Badger was not "from Cali," and (C) present evidence of a bloody shoeprint found at the scene of the murder in conjunction with a lack of blood evidence

inside of Badger's car. (Brief 7-19, doc. 2.)

### III. RULE 5 STATEMENT

The respondent does not assert that the § 2254 petition is untimely or that is successive. Respondent does argue that although Badger's first two claims appear to be exhausted, his third claim (ineffective assistance of counsel for not presenting shoeprint evidence) is unexhausted and procedurally barred. Respondent argues alternatively that Badger's third claims should be denied on the merits. (Resp. 8, doc. 12.)

### IV. STANDARD OF REVIEW

Section 2254(d) reflects the view that habeas corpus is a safeguard against extreme malfunctions in state criminal-justice systems, not a substitute for ordinary error correction through appeal. For claims that were adjudicated in state court, § 2254(d) imposes a highly deferential standard that demands that a federal court grant habeas relief only where one of two conditions are present in the state-court judgment. A federal court may grant relief from a state-court judgment if the state court either adjudicated a constitutional claim contrary to federal law or unreasonably applied clearly established federal law as determined by the United States Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 100-01 (2011) (citing *(Terry) Williams v. Taylor*, 529 U.S. 362,

412 (2002)). Or the court may grant relief if the state-court decision was based on an unreasonable determination of facts in light of the record. *Id.* Section 2254(d)'s standard is necessarily difficult to meet because it was so designed.

A state-court decision can be "contrary" to established federal law in two ways: (1) if the state court applies a rule that contradicts Supreme Court precedent, or (2) if the state court confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405–06. A state-court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. A state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. The focus of this test is not on the state court's method of reasoning, but rather on its ultimate legal conclusion. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

To decide whether a state court made an unreasonable application, a federal court "must determine what arguments or

theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, in reviewing a state court's merits adjudication for reasonableness, a federal court is limited to the record that was before the state court. *See* § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

The question for federal review is not whether the state court decision was incorrect, but whether it was unreasonable, which is a substantially higher threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Federal courts look to the "last reasoned opinion" as the state court's "decision." *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). If a higher state court offered different grounds for its ruling than a lower court, then only the higher court's decision is reviewed. *Id.* "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 526 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a

11

rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

This Court must accept as correct any factual determinations made by the state courts unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e); *see Ford v. Davis*, 910 F.3d 232, 234 (5th Cir. 2018) ("a state court's factual findings are presumed to be correct, and the applicant bears the burden of rebutting that presumption by clear and convincing evidence."). The presumption of correctness applies to both implicit and explicit factual findings. *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings [that] are necessary to the state court's conclusions of mixed law and fact."); *see also Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)(holding that state appellate courts' findings are entitled to the same respect that trial judges' findings receive). Deference to the factual findings of a state court is not dependent upon the quality of the state court's evidentiary hearing. *See Valdez*, 274 F.3d at 951 (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of

review."). Further, the district court can "infer the state court's factual findings" so long as "some indication of the legal basis for the state court's denial of relief" exists. *Ford*, 910 F.3d at 235 n.3 (citing *Goodwin v. Johnson*, 132 F.3d 162, 184 (5th Cir. 1997)).

Moreover, where the state's highest court's decision lacks any reasoning, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Sheppard v. Davis*, 967 F.3d 458, 467 (5th Cir. 2020) ("We consider not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it *could have* relied upon") (emphasis in original) (internal quotation omitted).

Furthermore, an evidentiary hearing is precluded unless: (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly

discovered evidence. *See (Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court can qualify as a "failure" under the plain meaning of § 2254(e)(2). *Id.* at 433. However, Section 2254(e)(2) has "force [only] where § 2254(d)(1) does not bar federal habeas relief." *Pinholster*, 563 U.S. at 185. Accordingly, even if a petitioner can leap the § 2254(e)(2) hurdle, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id*. And whatever discretion remains after *Pinholster* to hold an evidentiary hearing, it is still appropriate to deny such a hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v.Landrigan*, 550 U.S. 465, 474-75 (2007). Petitioner has not met this standard for a hearing, and any such request is denied.

Also, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

14

**V. ANALYSIS**

Badger alleges he was deprived of effective assistance of trial counsel because his trial attorney, Brian Bouffard, failed to: (A) sufficiently voir dire the venire panel, thereby allowing a possibly biased juror on the jury panel; (B) present exculpatory evidence at trial showing that Badger was from Michigan, not "Cali"; and (C) present exculpatory evidence in the form of a bloody shoeprint found at the murder scene. (Suppl. Pet. 7-19, doc. 2.) For the reasons explained below, these claims must be denied.

**A.   Law Applicable to Review of Ineffective Assistance Claims**

The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. In so doing, a convicted defendant must overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Strickland*, 466 U.S. at 689. "[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v.*

15

*Smith*, 539 U.S. 510, 521 (2003) (quoting *Id.* at 688.)

Next, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. To establish that he has sustained prejudice, the convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of Strickland; rather, the petitioner must "affirmatively prove" prejudice. *Id.* at 693.

Because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland*, 466 U.S. at 697.

With the above standards in mind, the Court turns to review of each of Badger's allegations of ineffective assistance of counsel.

## B.   Failure to Conduct Sufficient Voir Dire

Badger initially argues that counsel Bouffard performed ineffectively by failing to sufficiently question the venire to reveal juror Glenda Jordan's familial relationship with an employee of the district attorney's (DA's) office. (Brief 8-12, doc. 2.) This claim must be rejected because Bouffard reasonably believed

16

the voir-dire questioning addressed such relationships and Badger fails to show juror Jordan harbored any bias.

The trial record pertaining to this claim was summarized by the state appellate court. *See Badger*, 2019 WL 5089761 at *8-9; *see also* (4 RR at 8-16, doc. 13-5.) During state habeas proceedings, counsel Bouffard addressed this issue at length, averring that he thought the likelihood was "pretty high" that he would have used a peremptory challenge to strike Jordan from the jury had he known that she was the mother of an employee of the DA's office, but also concluding that he did not believe he rendered ineffective assistance of counsel. (SHCR at 231-32, doc. 13-24.) In reviewing this claim, the state habeas court concluded *inter alia* that:

> 28. Applicant has failed to show that Juror Jordan's relationship to an employee of the Tarrant County Criminal District Attorney's Office deprived him of a fair trial.

> 29. Counsel's performance during voir dire fell within the range of reasonably competent counsel.

> 30. Applicant has failed to show that but-for counsel's alleged error, the outcome of the trial would have been different.

(SHCR at 338, doc. 13-24.)

Upon review of this claim now in this proceeding, Badger's claim fails both prongs of *Strickland* when viewed through the deferential lens of AEDPA.

Counsel Bouffard reasonably believed the question about

17

whether any jurors or someone close to them ever worked in law enforcement (4 RR at 15–16, doc. 13-5) would prompt disclosure of relationships like juror Jordan's maternal relationship to an employee of the DA's office. (SHCR at 230 ("I believe 'law enforcement' clearly includes criminal prosecutors . . ."), doc. 13-24.) This seems consistent with the thought process of an ordinary and reasonably prudent attorney, just as juror Jordan could have reasonably believed that her daughter's work as a public relations specialist for the DA's office does not constitute "law enforcement." The fact that an attorney and a civilian juror could interpret a phrase such as "worked in law enforcement" differently in this context is not unusual. Nor does this conflict in understanding of these terms render counsel's conduct during voir dire deficient.

While Badger's claim fails to meet *Strickland's* deficiency prong, it also fails under the prejudice prong. Badger cites no evidence of juror Jordan harboring bias against him or his case. (Brief at 7–12, doc. 2.) Badger provides no legal authority to show Jordan's relation to an employee of the DA's office would be sufficient to impute bias to her without any other evidence of bias. *Id.* On the contrary, state and federal case law suggests that Jordan's relationship would *not* be enough to impute bias to her. *See State v. Morales*, 253 S.W.3d 686, 693 (Tex. Crim. App. 2008) (an assistant district attorney in the same office as the

18

prosecution, but who has no personal involvement in the prosecution
is not presumed to be biased under Texas law); *Smith v. Phillips*,
455 U.S. 209, 222 (1982)(refusing to impute bias to a juror where
the juror sought employment with the prosecutor's office during
trial). Furthermore, Badger provides no reason to believe a
replacement juror would have disagreed with the other eleven jurors
in assessing Badger's guilt beyond a reasonable doubt, especially
considering the overwhelming evidence against Badger. *See generally*
Factual Background, *Badger v. State*, 2019 WL 5089761 at *1-4.
Because Badger fails to show how replacing juror Jordan could have
made any difference in the outcome of his trial, this claim also
fails *Strickland's* prejudice prong.

In addition to this claim's failing *Strickland* analysis on its
face, Badger cannot establish that the state court's denial of this
claim was a decision that was contrary to, or involved an
unreasonable application of, clearly established federal law, as
determined by the Supreme Court of the United States. 28 U.S.C. §
2254(d). Badger focuses much of his argument on contesting the
state habeas conclusions which, in his view, improperly relied on
the state appellate court's statements made under an "abuse of
discretion" standard. (Brief at 7–11, doc. 2.) But this argument
ignores the fact that the TCCA also expressly based its denial on
its "independent review of the record." (SHCR at "Action Taken"
cover sheet, doc. 13-20.) The state habeas court also rejected

Badger's claim under the federal *Strickland* standard. (SHCR at 334-35, 338 (conclusion nos. 4-12, 28-31), doc. 13-24.)

For all of these reasons, Badger's first claim that counsel was ineffective for failing to adequately raise a challenge to a juror during voir dire must be denied.

**C.   Failure to present evidence about Badger's geographic origin**

In his second ground for relief, Badger argues that counsel Bouffard performed ineffectively by not presenting exculpatory evidence at trial in the form of evidence showing that Badger was from Michigan, not "Cali" as indicated in an excluded hearsay statement. (Brief at 13-16, doc. 2.) But since counsel acted based on reasonable trial strategy and this evidence did not impact on the verdict, this claim must be rejected.

Counsel based his decision to not pursue the evidence about Badger's home state on reasonable trial strategy. As he explains in an affidavit filed in the state-court proceedings, this evidence depended on hearsay testimony from the victim's girlfriend, Vanessa Valle. (SHCR at 232-34, doc. 13-24.) Valle relayed that the victim, during a break from work just three hours before he was murdered, told her that he had an altercation with a coworker. (*Id.*; CR 88 (State's disclosure of Valle's statement), doc. 13-24.) During this altercation, Valle relayed that the coworker threatened victim Hicks, stating "Nigger, I don't play. I'm from Cali. We murder niggers." (CR 88, doc. 13-1.)

Counsel explained his strategy in detail. (SHCR at 234, doc. 13-24.) In sum, counsel states that he strategically decided that it would be more beneficial for Badger's defense to exclude Valle's statement, because her statement provided a motive for the murder and pointed to a co-worker as the killer, while the statement "I'm from Cali" was "a weak piece of evidence anyways, and reasonably could have been viewed by the jury as mere bombast with no particular reason to believe it was literally true . . . ." (*Id.*) Thus, counsel acted based on sound trial strategy. *See generally Strickland*, 466 U.S. at 689 (stating "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'").

Badger, on the other hand, offers little rebuttal to counsel's strategy despite counsel's lengthy explanation of his strategy and *Strickland's* dictates to consider trial counsel's strategy.(Brief at 14-15, doc. 2.) Badger appears to suggest that counsel Bouffard's strategy is negated by the fact that Valle testified that the victim was "upset" with a coworker. (*Id.; see also* 4 RR at 41-42, doc. 13-5.) But this counter argument is unpersuasive, as a trial attorney could reasonably believe that testimony indicating that the victim was "upset" with a co-worker, is easily distinguishable from testimony indicating that a coworker was threatening to murder the victim.

Since Badger fails to rebut the presumption that counsel

21

Bouffard acted based on sound trial strategy in not pursuing evidence about Badger's home state, this claim fails. This conclusion accords with the conclusions adopted by the state habeas court. (SHCR at 338-39 (conclusion nos. 32-40), doc. 13-24.) Since Badger cannot establish that the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, this claim must be denied. 28 U.S.C. § 2254(d).

### D.   **Failure to present evidence about a bloody shoeprint**

Finally, Badger argues that counsel Bouffard performed ineffectively by not presenting a photo of a bloody shoeprint at the murder scene to argue Badger's innocence because there was no blood found on the floorboard of Badger's car despite the car's being seized shortly after the murder. (Suppl. Pet. at 16-19, 115 (photo of shoeprint), doc. 2); 8 RR, State's Exh. No. 43 (another photo with shoeprint), doc. 13-9.)

### (i)   Claim is Unexhausted and Procedurally Barred

To the extent this claim depends on Badger's factual allegation that no blood was found in Badger's car, this claim factually differs from the claim Badger made in state court, and he has not met the exhaustion requirements of 28 U.S.C. § 2254(b) and (c), which read in pertinent part as follows:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of

a State court shall not be granted unless it appears
that-- (A) the applicant has exhausted the remedies
available in the courts of the State; . .

(c) an applicant shall not be deemed to have exhausted
the remedies available in the courts of the State, within
the meaning of this section, if he has the right under
the law of the State to raise, by any available
procedure, the question presented.

28 U.S.C. § 2254 (West 2022).

Badger must have first provided to the highest court of the
state a fair opportunity to apply (1) the controlling federal
constitutional principles to (2) the same factual claims, before a
federal court will entertain the alleged errors. *Duncan v. Henry*,
513 U.S. 364, 365-366 (1995); *Picard v. Connor*, 404 U.S. 270, 275,
277-78 (1971). The exhaustion doctrine is based on principles of
comity between the state and federal judicial systems and "reflects
a desire to 'protect the state courts' role in the enforcement of
federal law.'" *Castille v. Peoples*, 489 U.S. 346, 349 (1989)
(quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). To satisfy the
exhaustion requirement, Badger must have not only presented his
claims to the highest state court, but he must have presented them
in a procedurally correct manner. *Castille*, 489 U.S. at 351.

In the instant case, Badger argues that, to undermine the
state's case, Bouffard should have introduced evidence of a faint
bloody shoeprint found at the murder scene in conjunction with the
lack of blood evidence on the floorboard of Badger's car. (Brief at

23

16-19, doc. 2.) But this argument is significantly different from the argument Badger presented in state court. In state court, Badger argued that counsel should have introduced the bloody shoeprint to show that the pattern of the shoeprint was inconsistent with the shoes found in Badger's closet in his home. (SHCR at 163-64, doc. 13-24.)

Because Badger's state-court version of this claim focused on the difference between shoe pattern in the shoeprint and the shoe pattern of the shoes found in Badger's closet, the state court proceedings also focused on these facts. Responding to Badger's allegations, counsel's affidavit focused on the shoe patterns, explaining that the shoe patterns were not helpful because Badger obviously had ample opportunity to discard or destroy the shoes he wore during the murder. (SHCR at 235, doc. 13-24.) Similarly, the state habeas court's findings and conclusions of law addressed Badger's argument that the shoe patterns did not match. In this regard, the state court concluded, "Applicant has failed to demonstrate that the outcome of the trial would have been different had Mr. Bouffard introduced evidence regarding the comparison of the bloody shoeprint to the shoes recovered from his residence." (SHCR at 339-40 (conclusion nos. 41-44 rejecting Badger's argument that the shoe patterns were exculpatory), doc. 13-24.)

Now, in this federal habeas-corpus petition, Badger claims the shoeprint is exculpatory because of a "lack of blood" in his car.

(Brief at 16–19, doc. 2.) But state-court records do not appear to have any information about whether there was blood inside of his car and Badger does not cite any records or evidence to support this factual assertion. (Brief at 18("The lack of blood from the interior of Badger's car would have confirmed the shoeprint did not belong to Badger either. [*no citation*]"), doc. 2.) Thus, Badger's claim that there was no blood in his car has not been reviewed in state-court proceedings.

Since Badger failed to inform the state court of the same facts and legal theories in support of his claim, his claim is now unexhausted because he did not fairly present his claim to the state court before coming to the federal court. *See Picard*, 404 U.S. at 276–77(a petitioner must have informed the state court system of the same facts and legal theories upon which he bases his assertions in his federal petition). Because this claim is unexhausted and Badger cannot now go back to state court, this claim is procedurally defaulted.

In this regard, Badger already petitioned for a state writ challenging the circumstances surrounding his conviction, therefore any attempt to petition for another state writ challenging the same conviction would result in a citation for abuse of the state writ by the Texas Court of Criminal Appeals. *See Ex parte Whiteside*, 12 S.W.3d 819, 821–22 (Tex. Crim. App. 2000). It is well settled that citation for abuse of the writ by the TCCA constitutes a procedural

25

default that bars federal habeas review of the merits of a habeas petitioner's claims. *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997). The Fifth Circuit has noted that the TCCA applies its abuse-of-the-writ rules regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). A state court must explicitly apply a procedural bar to preclude federal review in cases where a petitioner has failed to exhaust his state-court remedies and the state court to which he would be required to present his unexhausted claims would now find these claims to be procedurally barred. *Id.* In such cases, the federal procedural-default doctrine precludes federal habeas-corpus review. *Id*; *see Nobles*, 127 F.3d at 423 (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred).

Since the factual basis of this claim fundamentally differs from the claim Badger presented before the TCCA, the responding state authorities were denied the opportunity to rebut his factual allegation that no blood was found in Badger's car. Thus, the Court initially determines that Badger's third ground for relief is procedurally barred from review.

(ii)      <u>Ground is also Without Merit</u>

Regardless of the procedural defects in Badger's petition the Court may deny this third ground for relief on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may

26

be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Badger argues that the shoeprint was exculpatory, because "[h]ad Badger stepped in the blood at the scene, it would have transferred to the interior of his car. He did not have time to clean it up." (Brief at 17, doc. 2.) Therefore, Badger argues, "[t]he lack of blood from the interior of Badger's car would have confirmed the shoeprint did not belong to Badger," suggesting another suspect committed the murder. (*Id.* at 18.)

The problem with Badger's argument is that he offers nothing to sustain his factual assertion that there was a "lack of blood from the interior of Badger's car" or "none of the victim's blood was found inside Badger's car." (*Id.* at 17, 18 (no citations to support quoted statements), doc. 2.) On the contrary, a careful review of the photographs in evidence shows red spots on the floorboard of Badger's car that would be consistent with the transfer of blood. (8 RR, State's Exh. No. 74, doc. 13-10.) Other than that photo, Badger does not identify any evidence about the presence or absence of blood inside of Badger's car.

Without any evidence to support his argument, Badger's claim must be denied because it depends on this conclusory factual allegation. *See Ross v. Estelle*, 694 F. 2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a

habeas petitioner's bald assertions on a critical issue in his pro se petition, unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."). Moreover, Badger cannot carry his burden to show ineffectiveness on this point if he cannot even show that Badger's car did not have blood in it. On the contrary, it would be a matter of sound trial strategy for counsel Bouffard to stay silent on the issue if the victim's blood could have been inside Badger's car.

To the extent Badger reasserts his state habeas claim that the shoeprint was exculpatory because it did not match the shoes found in Badger's closet, his claim fails because Bouffard discounted the shoeprint evidence based on trial strategy. In short, the shoes found in Badger's closet almost certainly were not the shoes he wore at the time of the murder since he fled the scene, fled his home, and was not found for nearly a week after the murder. (SHCR at 235 (Bouffard explaining that "[t]he reason why [the shoeprint] is not exculpatory is that Mr. Badger was not apprehended until almost a week after this incident. There is no evidence, nor even reason to believe, that any of the shoes seized from his house the night of the shooting were those worn by him at the time of the shooting, and thus capable of making the blood shoeprint."), doc. 13-24.) Consequently, the state habeas court concluded Bouffard represented Badger effectively in this capacity as well. The state court concluded:

43. Mr. Bouffard's strategic decision not to elicit the nonmatch of the bloody shoeprint with shoes recovered from Applicant's residence is within the range of reasonably competent counsel.

44. Applicant has failed to demonstrate that the outcome of the trial would have been different had Mr. Bouffard introduced evidence regarding the comparison of the bloody shoeprint to the shoes recovered from his residence.

(SHCR at 340, doc. 13-24.)

Because Badger fails to show how Bouffard acted deficiently or prejudicially, he cannot establish that the state court's denial of this claim was a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this claim must be denied. 28 U.S.C. § 2254(d); *see Richter*, 562 U.S. at 105 ("the standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so").

## VI. BADGER'S REPLY

Badger filed a reply focused on three arguments: (1) that trial counsel was ineffective by not allowing hearsay evidence that the victim's coworker stated "I'm from Cali" amidst his arguments and threats toward the victim; (2) that three portions of the record show that the claim counsel should have challenged that no blood was found on the floorboard was properly exhausted; (3) that his trial counsel performed ineffectively by not arguing that no blood

was found on the floorboard of Badger's car. The Court will address these first two grounds, but need not further address the merits of the claim that counsel was ineffective for failing to assert a lack of blood evidence in Badger's car.

## A.    Failure to Present the "I'm from Cali" Hearsay Evidence

Badger again argues that counsel effectively deprived him of his right to competent counsel when he objected to hearsay from the victim's girlfriend (Valle), instead of allowing her hearsay testimony that, hours before he was killed, the victim told her that he got into an argument with an unnamed coworker who, while threatening his life, stated "I'm from Cali." (Reply at 1-2, doc. 15; CR 88 (State's disclosure of Valle's hearsay statement), doc. 13-1. To do so, he relies on *Brady v. Maryland*, 373 U.S. 83, 87 (1963) precedent, arguing that counsel should have allowed the "I'm from Cali" statement[3] because Badger is from Michigan and the phrase was exculpatory under *Brady*. (Reply 1-2, doc. 15.)

But this is not a *Brady* claim. It's a *Strickland* claim. The question is not whether the isolated hearsay statement is

---

6The Respondent points out that Badger's argument assumes the phrase "I'm from Cali" is to be understood as literally meaning "I'm from California," but questions that assumption. Sur-Reply 2, ECF No. 17 (citing, *e.g.*, Lauren Anderson, *California Slangs and Sayings*, USC American Language Institute (March 31, 2020), https://ali.usc.edu/blog/the-slang-and-sayings-of-californians ("'Cali' is an abbreviation of 'California' that only non-Californians use. Nearly every other U.S. state calls California 'Cali,' but Californians hate this. Avoid using 'Cali' if you want to seem like a native Californian.").

"exculpatory." The question is whether Bouffard's decision to object to that testimony was deficient representation and whether that deficiency had a reasonable probability of altering the outcome of the case. *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). Of course, the *Strickland* standard is in addition to Section 2254(d) deference this Court must give to the state-court decision. *Harrington*, 562 U.S. at 105.

Review confirms that the "I'm from Cali" hearsay does not exist in a vacuum. It is blended with several inculpatory hearsay statements and it comes from a witness who is hostile to Badger's case. If counsel allowed the victim's girlfriend to testify to that hearsay, he would have also opened the door to hearsay that the coworker also threatened to go home and "get his piece" and "murder" the victim on the same night the victim was shot and murdered, thereby painting victim Hicks's coworker (Badger) as his likely killer.(CR 88, doc. 13-1.) Such hearsay, together with evidence proving that Badger was the victim's coworker that night and left work at the same time as the victim, would have been more harmful than beneficial to Badger's defense. (4 RR 56-57, doc. 13-5.) So, counsel operated based on sound trial strategy in objecting to Valle's damaging hearsay testimony. (SHCR at 233-34, doc. 13-24.)

## B.   Failure to Exhaust "bloodless floorboard" argument

Badger also objects to Respondent's argument that his final

ineffective-assistance claim is unexhausted and procedurally barred under 28 U.S.C. § 2254(b) and (c).(Reply 3-6, doc. 15.)  As noted above, the Court determined that his state habeas claim is unexhausted and procedurally barred because Badger's state claim was factually different from Badger's federal claim, as Badger's arguments in state court did not question whether the victim's blood was found in his car.

Badger argues in his reply that three separate excerpts from the record support his argument that he completed exhaustion: (i) his original 11.07 state habeas application; (ii) his objection to the state trial court's findings of fact and conclusions of law; and (iii) his request for reconsideration before the TCCA. (Reply at 3-5, doc. 15.) The Court addresses these arguments below.

(i)  11.07 State Habeas Application Excerpt

Certainly, raising his "bloodless floorboard" argument in his original 11.07 application would have sufficed to exhaust his claim. But review of Badger's state habeas application excerpt only reinforces Respondent's argument that Badger's original claim had nothing to do with whether blood was found on his car's floorboard. Instead, his excerpt only emphasizes that his claim in his state habeas application was about whether his attorney should have compared the bloody shoeprint and the shoes found in Badger's closet several days after the commission of the crime. Reply at 3-4 (section entitled "From Petitioner's 11.07 Writ of Habeas Corpus

Application"), doc. 15.). This argument is rejected.

    (ii)       <u>Excerpt from his objections to habeas trial court findings</u>

Badger's second citation to an excerpt from the record at least shows that Badger began changing the factual basis of his argument to the allegedly bloodless floorboard in his objections to the state-court findings. (Reply at 4("None of Applicant's shoes matched the print, and more convincingly, there was no blood found in Applicant's car. Had Applicant stepped in the blood, there would have been blood inside his car"), doc. 15.) But as explained below, this mention of the factual basis for his "bloodless floorboard" was presented beyond the applicable deadlines.

Reliance on this second excerpt is too late because Badger did not file this objection until August 2, 2021, 24 days after the state habeas trial court adopted its findings of fact and conclusions of law on July 9, 2021.(SHCR 346 (order adopting state magistrate's findings), doc. 13-24;(SHCR supp.) at 4 ("Applicant's Objections to Trial Court's Findings of Fact and Conclusions of Law"), doc. 13-22.) Since his objection was due within 10 days of the trial court's findings, this objection was statutorily barred from consideration. Tex. R. App. P. 73.4(b)(2) ("A party has ten days from the date he receives the trial court's findings of fact and conclusions of law to file objections . . .").

Moreover, even if this objection were somehow timely, it was asserted in a procedurally improper pleading for raising a new

ground for relief. As a judge from the TCCA summarized,

> In terms of content, [Rule 73 of TRAP] requires the applicant to "provide all information required by the form [for an application for habeas corpus]. The form *must include all grounds for relief* and *set forth in summary fashion the facts supporting each ground*. Any ground not raised on the form will not be considered. Legal citations and arguments may be made in separate memorandum." Tex. R. App. P. 73.1(c)(emphasis added). This memorandum "shall" also comply with the rules pertaining to length and format. Tex. R. App. P. 73.1(d). Importantly, Rule 73.2 allows this Court to dismiss any application that does not comply with the rules. Tex. R. App. P. 73.2.

*Ex parte Flowers*, 665 S.W.3d 575 (Tex. Crim. App. 2022) (J. Slaughter, dissenting). Since Badger did not include his new claim within the state habeas application form, it violates the requirements of Rule 73. Nor did Badger characterize his "objections" as an amended application or advance an intent to supplement his original application with new grounds for relief. *See Ex parte Saenz*, 491 S.W.3d 819, 824 (Tex. Crim. App. 2016) ("In general, when an applicant files amended or supplemental pleadings raising additional claims before we have disposed of his pending application, we consider the merits of his claims, so long as the pleadings comply with the rules and procedures in Article 11.07 and Rule of Appellate Procedure 73.1, and so long as the claims are otherwise cognizable and ripe for review.") Also, since Badger's untimely objections were filed long after counsel presented an affidavit refuting Badger's allegations, he vitiated the state court's ability to legally address Badger's claim that counsel

34

performed ineffectively as to the issue of evidence of blood in the car.

As noted above, to exhaust his claim under 28 U.S.C. §§ 2254(b)-(c), Badger needed to fairly present his claim in state court in a procedurally proper manner, so that it could be considered on its merits. See *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("To . . . 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts." (internal citations omitted and emphasis in original)). Because his objection did not present a proper presentation of a new claim, it does not serve to exhaust that claim.

(iii)       <u>Excerpt from his Motion for Reconsideration</u>

In his third basis challenging the lack-of-exhaustion determination, Badger quotes his argument presented in state court as a "Request for Reconsideration on Court's Own Motion," which again briefly complains about an alleged lack of blood on his vehicle's floorboard. (Reply at 4-5 (quoting "Request for Reconsideration" in SHCR MFR at doc. 13-21), doc. 15.) But even if this excerpt could be said to have clearly raised an ineffective-assistance claim based on the "bloodless" floorboard argument, Badger's "request" for reconsideration fails to exhaust his state

remedies because such motions for reconsideration are not permitted under state law.

In this regard, Texas Rule of Appellate Procedure 73.1(c) requires habeas applicants to raise all grounds for relief in their original habeas application. *See* Tex R. App. P. 73.1(c). Texas law also forbids motions for reconsideration in state habeas cases: "[a] motion for rehearing an order that denies habeas corpus relief or dismisses a habeas corpus application under Code of Criminal Procedure, articles 11.07 or 11.071, may not be filed." Tex. R. App. P. 79.2(d). Given this prohibition, another court in this district recently rejected a similar argument:

> The closest that [§ 2254 Petitioner] came to raising this ground for relief was in his motion for reconsideration, but presenting a ground for relief in a motion for reconsideration to the state habeas court does not exhaust it. *See Williams v. Johnson*, 169 F. Supp. 2d 594, 599 (N.D. Tex. 2001) ("Petitioner has not presented the claim regarding violation of the Sixth Amendment and denial of a fair trial. Presentation of this issue in a motion for reconsideration does not satisfy the exhaustion required.").

*Humphries v. Director*, No. 3:19-CV-2100-B-BN, 2021 WL 784139, *12 (N.D. Tex. Jan. 5, 2021), *rep. and rec. adopted*, 2021 WL 1422271 (N.D. Tex. Apr. 15, 2021). Indeed, district courts have repeatedly denied § 2254 petitioners' arguments that they exhausted their state-court remedies by raising an argument for the first time in a motion for reconsideration. *Althouse v. Davis*, No. 3:18-CV-3091-B-BK, 2019 WL 4228594, at *2 (N.D. Tex. Aug. 19, 2019) ("Texas law does not permit a motion for rehearing of an order that

denies habeas corpus relief. *See* Tex. R. App. P. 79.2(d). As such, the TCCA did not have an opportunity to consider [Petitioner's] claim or any of his evidence and his second claim remains unexhausted"), *rep. and rec. adopted*, 2019 WL 4201560 (N.D. Tex. Sep. 5, 2019); *cf. Olivares v. Quarterman*, No. V-04-67, 2008 WL 416256, at *9 (S.D. Tex. Feb. 13, 2008).

Respondent notes these decisions are consistent with good policy. (Sur-Reply 7, doc. 17.) If state habeas applicants could raise arguments for the first time in a motion for reconsideration, it would bypass or inhibit the State's ability to respond to or investigate such claims. It also would defeat AEDPA's purposes of reducing litigation and encouraging the finality of convictions. In this case, the state habeas trial court and defense counsel went to great lengths to address the claims Badger raised in his initial state habeas application. Allowing Badger to present new claims after his initial application would unnecessarily burden the state court and defense counsel.

Because the record shows that Badger improperly attempted to raise a new factual basis for his claim in his motion for reconsideration, he did not fairly present the claim in a way that could be considered on its merits. *See O'Sullivan v. Boerckel*, 526 U.S. at 848. Thus, Badger's third excerpt from the record is also insufficient to show he exhausted his state-court remedies as required under 28 U.S.C. § 2254(b)-(c).

## VII. CONCLUSION

For all of the reasons expressed, the Court **DENIES** Qwenton Narvell Badger's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

Further, Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. A certificate of appealability may issue "only if the [petitioner] has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). When the district court denies the petition on procedural grounds without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (quoting *Slack,* 529 U.S. at 484). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of Petitioner's

constitutional claims and/or procedural rulings. Therefore, a certificate of appealability should not issue.

SIGNED March 20, 2024.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

39